NOTICE
Decision filed 07/21/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260164-U

NO. 5-26-0164

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ADOPTION OF MYCAIAH H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Lauren H. R. and Gregory R., | ) | Macon County. |
| | ) | |
| Petitioners-Appellees, | ) | |
| | ) | |
| v. | ) | No. 25-AD-50 |
| | ) | |
| Jay R., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Boie and Bollinger concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's judgment terminating the respondent's parental rights was not against the manifest weight of the evidence. Pursuant to the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)), the petitioner showed that the respondent was an unfit parent and that termination was in the best interest of the minor. Therefore, the judgment of the circuit court is affirmed.

¶ 2   The respondent, Jay R. (Father), appeals from the Macon County circuit court's orders of December 17, 2025, and January 29, 2026, finding him an unfit parent and finding that termination of his parental rights was in the minor's best interest, respectively. For the reasons explained below, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On March 20, 2025, petitioners Lauren H. and Gregory R. filed a motion for a finding of parental unfitness against Father and a petition to adopt the minor Mycaiah H. The filing stated that the five-year-old minor was the biological daughter of Lauren H. (Mother) and Father, and resided with Mother. It further stated that Mother had exercised primary care and control of the minor since her birth, and that Gregory R.[1] had been in the minor's life since 2023. Father was currently incarcerated, serving an 18-month prison sentence for violating an order of protection and parole. He was expected to be paroled in August of 2026.

¶ 5      The petitioners alleged that Father was an unfit parent pursuant to section 1(D) of the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)) on the following grounds: (1) abandoning the minor (750 ILCS 50/1(D)(a) (West 2022)); (2) failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2022)); (3) deserting the minor for more than three months (750 ILCS 50/1(D)(c) (West 2022)); (4) depravity, in that he had three felony convictions, at least one of which took place within five years of the filing[2] (750 ILCS 50/1(D)(i) (West 2022)); (5) evidencing an intent to forego his parental rights, by failing for over two years to make a good faith effort to pay a reasonable amount of the minor's birth expenses and provide a reasonable amount of support for her (750 ILCS 50/1(D)(n)(2) (West 2022)); and (6) repeatedly and continuously failing to provide the minor with adequate food, clothing, or shelter, despite being physically and financially able (750 ILCS

_____

[1]Gregory R., Mother's now-husband, was a petitioner in the underlying matter, but is not a party to this appeal. At the time of the petition, Mother's surname was H., and we refer to her as such here.
[2]The petitioners listed 11 criminal cases that resulted in felony convictions for Father. The earliest case occurred in 2007, and the latest conviction—the one for which he was currently incarcerated—was in 2023.

50/1(D)(o) (West 2022)). The conviction in the most recent case was entered in January 2023 and Father was presently serving the aforementioned 18-month sentence.

¶ 6                                A. Fitness Hearing

¶ 7     The circuit court held a fitness hearing on October 28, 2025. Counsel for the petitioners introduced as an exhibit Father's felony conviction record, and noted to the court that the most recent conviction occurred within the last five years. The court then heard witness testimony.

¶ 8     Tykyna Cole testified for the petitioners. She explained that she was a licensed private practice counselor who started counseling Mother in 2015 and also had five or six sessions with Father beginning in 2019. Mother was pregnant with the minor in 2019, and Father had recently been released from prison. Cole stated that Mother and Father had split up by the time Father started counseling, but Mother was motivated to work on building a healthy co-parenting relationship with him for their child. She asked Cole to work with him on how he could improve himself. Cole recommended to Father that he pursue addiction recovery, and that Mother attend sessions with him. Mother declined to do the latter, stating that Father was "not ready yet." Cole described Father as showing behaviors of active addiction while she was counseling him, and she did not believe that he was working on recovery.

¶ 9     While Cole was still counseling Mother at the time of the hearing, Father stopped attending after the five or six sessions. Based on her clinical observations of Father, Cole opined that she did not know whether he knew how to be a parent to the minor. She had no evidence of him being a parent, being stable enough to care for a child, or showing any commitment to doing the necessary work to get there.

¶ 10    On cross-examination, Cole testified that she talked with Father about the recovery process in their last session together, and he told her that he had "done it so many times" that he knew

3

"what to tell them" and could "bullshit [his] way through." He would agree to go to meetings, but he would never follow through. She also explained that under the conditions she observed and had been hearing from Mother over the past five years, Father would not be able to provide stability for the child. During the entirety of the minor's life, Father was in a cycle "where he goes to jail, he gets clean, he connects with a lady, he gets out, he makes all these promises, he does not keep them, and then he goes back into his lifestyle *** and then he gets arrested and he leaves."

¶ 11    Mother testified next, stating that she and Gregory R. had married in August of 2025. In 2019, she reconnected with Father upon his release from prison and she became pregnant. Father lived with her for five weeks, and during that time, he became more and more aggressive, verbally abusive, and manipulative. She began to feel unsafe with him, and later found out from Father that he was using illegal drugs in the home. Mother obtained an order of protection against Father because of his worsening addiction, instability, and abusive behavior. He also sent her excessive messages, including approximately 600 messages in one day, and took money from her. The minor was not named in the order of protection, as she had not yet been born. The order of protection expired in March of 2022.[3]

¶ 12    Even after Father was no longer living with her, Mother testified that she stayed in contact with him in order to try to build a co-parenting relationship. She originally allowed him into her home to visit the minor, but later had him meet her at his grandparents' house so that there would be other people around when he saw the minor. She described him as being "never there" during those visits; sometimes he would come over and just go to sleep. At times, he would interact with

---

[3]Mother testified that some of her efforts to communicate with Father and have him see his child occurred while the order of protection remained in place.

the minor, playing with her, but he was always exhausted and never fully present. Mother did not know whether Father was employed during that time. He did not have a stable place to live.

¶ 13    Mother further testified about a paternity action filed by Father in June of 2020. Her understanding was that the circuit court ordered DNA testing at Father's request, but it was never completed. Additionally, child support was never established in that case. Mother never disputed that Father was the natural father of her child.

¶ 14    In her efforts to establish a co-parenting relationship with Father, Mother told him that she required him to demonstrate for one year that he could remain sober, maintain stable employment and housing, and behave as a "normal person in society who's not breaking the law and who's following the rules and [is] just a safe person for" the minor. She added that she did not trust him to provide proof of sobriety via drug testing, as she knew him to have previously falsified urine samples. Father agreed to the conditions, but did not follow through on them.

¶ 15    According to Mother, Father was in and out of prison for some time from 2020 to 2022. He was released from prison in January of 2023 and went to rehab the following month. Afterwards, he asked her to visit him at his residence, which Mother did. She testified that the house was clean, although it did not have a bedroom for the minor. Father told her that he was employed, but Mother did not know whether this was true.

¶ 16    Over the almost-six years since the minor's birth, Mother estimated that Father provided around $500 to $550 in monetary support for the minor, plus an additional $250 to $300 that she spent on groceries from his LINK card. She also recalled one time that Father gave her some diapers and other items for the newborn minor and a couple of other times when he gave her clothing. These occurred during periods in which Mother and Father were communicating with

5

each other. Outside of those times, Father never provided any support, nor did he try to send Mother anything through family members.

¶ 17    When asked about Father's current incarceration, Mother explained that it was for multiple parole violations and violating the order of protection in 2020 by messaging her. After the order of protection ended in March of 2022, Mother attempted to let Father see the minor; he had promised to go to rehab while on probation, and to follow through with her other demands. Despite the fact that Father had not yet met her requirement of demonstrating his life changes for a full year, she brought the minor to see him shortly after his release from jail, explaining that this was because she could trust that he was sober just after his release. However, three days later, he disappeared for a night and admitted the following day that he had been using drugs.

¶ 18    After this incident, Father restarted rehab, and was living in transitional housing. During this time, Mother would take the minor to see him. On one occasion, Mother and the minor were celebrating Easter with his family. While she was driving him back to where he was staying, he asked to stop by his grandparents' house so he could pick up a change of clothes. Mother later learned that Father had actually picked up drugs, which he brought in the car with her and the minor.

¶ 19    Mother opined that Father was not focused on having a relationship with the minor. Rather, he seemed to be more concerned with having a relationship with Mother, and being able to do as he pleased while still seeing the minor whenever he wanted. She also testified that he would be manipulative or angry toward Mother, telling her she could not keep him away from the minor and that he would take Mother to court. During his periods of incarceration, Father never sent cards or letters to the minor, and only marked her birthday on one occasion, giving her a couple of presents in 2022. He had spent over half of the minor's life in either jail, prison, or rehab, and during the

6

remaining times, he did not make efforts to have a relationship with her. She concluded that, at present, she could not trust Father to be a safe parent for the minor.

¶ 20 Next, Father testified about the five weeks in 2019 during which he lived with Mother. He stated that he had been paying his share of the rent and utilities, and that Mother changed the locks on the house while he was out one day, preventing him from returning. He stated that he stopped attending counseling sessions with Cole in the fall of 2019 because she was friends with Mother and thus biased against him, and because he was seeing a therapist through the recovery program he entered at the start of 2020. He stated that he finished the inpatient rehab program and subsequently finished an outpatient program.

¶ 21 According to Father, Mother contacted him the day before the minor was born, but he was unable to attend the birth or sign the birth certificate because of COVID-19 restrictions and the order of protection. Regardless, he testified that he tried to be there for Mother, despite his concern about her inviting him into her home to meet the child while the order of protection was active. Father also testified about the paternity case he filed in June of 2020, stating that he wanted to see his daughter and did not know what steps to take. The reason he gave for not following through on DNA testing or seeking parenting time was because Mother did not contest his paternity, and he believed that they could work things out between themselves without involving the courts.

¶ 22 Father's first return to Illinois Department of Corrections (IDOC) custody following the minor's birth was due to being charged with violating the order of protection; Mother contacted the police because he had texted her in August or September of 2020. After six weeks in jail, his parole was reinstated. In November, he sent Mother Thanksgiving wishes in a group chat they had with his own mother, and Mother contacted the police again. He was incarcerated again for violating parole by violating the order of protection. While he was in IDOC custody, Mother

vouched for him and helped put off his charges for violating the order of protection. Mother and Father were communicating with each other during this time, and Mother told him to take accountability for his actions. He ended up pleading guilty to the charges.

¶ 23    Father was released in March of 2021 and arrested in November of 2021 on a charge of delivering methamphetamine, but he was wrongfully identified, and the charges were dropped. After his latest release from IDOC custody, Mother stopped communicating with him. Then in 2023, Mother visited him at the transitional housing where he was living at the time. She did not bring the minor. Father testified that he gave Mother money for the minor's care any time that he had some available, and he tried to give her his LINK card to use. However, he stated that he could have done more and wished that he had. He was out of addiction treatment in February of 2023, but relapsed within a month and returned to rehab. He completed the program and continued outpatient treatment.

¶ 24    Father further stated that while he was not incarcerated, Mother never invited him to attend any of the minor's birthday parties or similar events, and she even refused to allow him to attend those events. Father stated that throughout the minor's life, there was some legal barrier to him contacting Mother, whether it was an order of protection or a no contact order.

¶ 25    Regarding his current incarceration, Father testified that his projected release date was February 5, 2026, but he was expected to be released on December 22, 2025. During his time in IDOC custody, he estimated that he completed 12 certificates, including for work-related skills and parenting. He agreed with Cole's testimony that he did not know how to be a good parent, but countered that he was willing to learn, because the minor was the most important thing in the world to him. His plans for after his release were to earn back his driver's license and take advantage of

8

an opportunity waiting for him to join the carpenters' union and obtain employment. He concluded that it was time for him to change.

¶ 26    On cross examination, Father was asked why he did not file a petition for visitation after the order of protection ended in 2022. He responded that he did not understand the process of filing a petition, and he had hoped that he and Mother could work things out together to be a family for the minor. Father also denied ever having drugs in the home with Mother when they lived together in 2019, or ever telling her that he did have drugs. He also denied ever having drugs in the car with the minor.

¶ 27    Father was also asked whether he ever sent Mother money through Cash App, even when she was not speaking to him. He responded that he once sent her $200, but it was still important to him that he be able to speak with Mother because that was the only way he could see his daughter. He acknowledged, however, that he could still support her without speaking to Mother by sending the money.

¶ 28    Father also recognized that he had spent most of the minor's life in jail, prison, or rehab, but reiterated that he believed he could change, if given the opportunity. The circuit court asked Father what he had done to establish a relationship with the minor. He responded that he had recently filed a petition for visitation, had made efforts to communicate with Mother, and had tried to enjoy every moment that Mother brought the minor to see him in the past. He estimated that he had seen the minor approximately eight times over the course of her life. However, he insisted that this was not by choice, and he tried to have Mother allow him more time with the minor.

¶ 29    Father also agreed that he had only given Mother approximately $550 in cash for the minor. He also stated that he had birthday cards and letters for her, but he did not know where to send them, so he kept them, hoping to one day be able to pass them along to the minor. On re-cross

9

examination, he acknowledged that he knew Mother's current address and sent her a letter in June of 2025. However, she never responded, so he did not know whether she received it. Last, Father stated that he was addicted to gambling and methamphetamine.

¶ 30    Next, Daphne Carter, Father's mother, testified on behalf of Father. She stated that she had been texting back and forth with Mother regarding the minor, but Mother ceased communications about 18 months ago and ignored all subsequent messages and calls from Carter. She also testified that she had consistently made attempts at having her family in Mother's life since the birth of the minor, but Mother refused contact. The only exceptions were the first month after the minor's birth, and for some amount of time beginning in December of 2022.

¶ 31    Carter believed that Mother used the minor as leverage over her and Father, making them "walk on eggshells" around Mother in the hopes of remaining in the minor's life. Carter stated that she also helped Mother support the minor by helping pay for gas, maternity clothes, and food, and buying the minor birthday and Christmas gifts whenever Mother allowed contact from Carter. On cross examination, Carter stated that Father never tried to communicate with Mother or the minor through Carter, nor did he have Carter pass along money or gifts for the minor. He further stated that he did not know how this would be possible for him to do.

¶ 32    Last, Mother was re-called as a rebuttal witness. She denied Father's claim that she was friends with Cole. She also stated that Father had never followed through on any of the changes he testified to making, such as getting sober and learning to be a better parent, and that she had heard such promises from him in the past. She further stated that, when Father was not incarcerated or in rehab, there had been times when she attempted to facilitate a relationship between him and the minor, but only if she felt it was safe. She similarly tried to involve Carter in the minor's life, and she testified that Carter and Father both agreed that Father needed to maintain sobriety and

10

stability for a year in order to demonstrate that he could safely parent the minor. However, Father never followed through on these requirements before his 2024 incarceration.

¶ 33    Mother also denied refusing to allow Father to attend the minor's birthday party in 2022, although she did express discomfort with his attendance. However, she testified that she still brought the minor to see Father when he was in transitional housing, and allowed him to personally give her gifts and spend some time with her. This was the only time that Father had ever provided gifts for the minor. Finally, Mother denied using the minor to manipulate Carter or Father, and asserted that all she wanted was for Father to be healthy and safe around their child.

¶ 34    After hearing arguments, the circuit court took the matter under advisement. The court issued a written order on December 17, 2025. The court wrote that Mother testified that she obtained an order of protection against Father shortly before the minor's birth due to his aggressive, abusive behavior and illegal drug use in the home. The order of protection granted the parties limited communication under specific circumstances, including that Mother would initiate the contact. The circuit court specifically noted that parenting time for the minor was never established in the order of protection, and Father never petitioned the court for parenting time.

¶ 35    The circuit court further found that, according to Mother's testimony, Father did not have stable housing when the minor was born. Father never followed through with the paternity case that he stated he filed in part to obtain parenting time, because he thought he and Mother could work out an arrangement without the courts. Approximately three months after the petition for adoption was filed, Father filed a petition for visitation in the adoption case, asking the court to order visitation between Father and the minor at the prison.

¶ 36    The court further noted that no child support order was ever entered, and Mother testified that Father gave her approximately $550 since the minor's birth, and allowed her to use his LINK

11

card, through which she received an additional $300. Father also bought diapers on one occasion, and may have given the minor an outfit. She said he never sent gifts through family members, and never sent cards or letters. Mother wanted Father to be consistently sober and working, and not incur any new criminal charges for one year before she would agree to regular, unsupervised parenting time.

¶ 37　The court wrote that Mother also testified about Father having drugs in the car with the minor, and his history of relapsing. The court also summarized Father's criminal history, which it described as "extensive." Father had at least 12 felony convictions and as many prison sentences. The court specifically noted his felony charges for violating the order of protection, violating probation, and other offenses since the minor's birth, as well as Mother's and Father's testimony that Father had been in jail, prison, or rehab for more than half of the minor's life. At the time of the fitness hearing, he was again in IDOC custody for violating parole by contacting Mother.

¶ 38　The circuit court also wrote about Father's testimony that, throughout the minor's entire life, there had been either an order of protection or no contact order in place prohibiting him from communicating with Mother, with certain exceptions. He also admitted that he "could have done more," regarding his relationships with Mother and the minor. He did complete several programs while incarcerated, including horticulture, cognitive behavioral thinking, and parenting. Father admitted that he did not know how to be a good parent, but said he was willing to learn, and that the minor is the most important thing in the world to him.

¶ 39　The court further found that Father testified to giving Mother money whenever she was speaking with him and when he had any. He admitted to being addicted to gambling and methamphetamine. He had seen the minor a total of eight times, and testified that he had letters saved to give her in the future, because he did not think Mother would give them to her.

12

¶ 40    After summarizing the relevant testimony, the circuit court found both Mother's and Father's testimony to be credible. It further found that Father failed to meaningfully pursue any parenting time or have any contact with the minor, or provide meaningful financial support, gifts, or cards for the minor. He had never provided her with financial, physical, or emotional support, even when he was not incarcerated, and his actions and life choices only diminished his ability to provide any such support.

¶ 41    Furthermore, he had been incarcerated or in rehab facilities for much of her life, which the court found to be the consequences of his own actions, and the repeated incarcerations negatively impacted his ability to fulfill parental responsibilities. The last time Father saw the minor was in the summer of 2024, and his lack of any meaningful relationship with her resulted from the choices that he made. Thus, the circuit court found that Father was an unfit parent on the following bases: (1) failure to maintain a reasonable degree of interest, concern, and responsibility as to the minor's welfare and (2) depravity, in that he had been convicted of at least three felonies, the latest of which occurred within five years of the filing of the petitioners' motion and petition.

¶ 42                    B. Best-Interest Hearing

¶ 43    The circuit court held a best-interest hearing on January 29, 2026. In advance of the hearing, the guardian *ad litem* (GAL) for the minor submitted a report to the circuit court, writing that the GAL's associate had interviewed the petitioners and observed the existence of a strong bond between both of them and the minor. The minor resided with Mother in a "safe, pleasant home." Gregory R. was Mother's fiancé, and the two were set to marry in the near future. He indicated that he was ready to welcome the minor into his life as if she were his biological daughter. The GAL's associate witnessed the paternal bond Gregory R. had with the minor. The GAL wrote that the minor was five years old, too young to fully appreciate the adoption process.

13

¶ 44 The GAL spoke with Father, who acknowledged his significant criminal history, but he believed that only one of his many felony convictions occurred after the birth of the minor. He described it as a "technical violation" of the order of protection, by messaging Mother. Father told the GAL that he never stopped trying to see his daughter. Father was currently released from IDOC custody, and indicated that he had been accepted into a rehab program and that he was eligible for housing benefits through his military service.

¶ 45 The GAL also wrote that Father's mother, Daphne Carter, sent the GAL at least 23 emails in an attempt to demonstrate the strong bond her family had with the minor. Based on the statutory best-interest factors, the GAL recommended that Father's parental rights be terminated and the petition for adoption be granted.

¶ 46 At the best-interest hearing, Mother testified that she and Gregory R. had married in August of 2025, that she had always been the minor's primary caretaker, and that the minor had known Gregory R. since she was three years old. Through spending lots of time with Mother and the minor, he grew close to the child, and developed a paternal relationship with her even before the marriage. He played with her and helped Mother care for her. He also became the kind of stable father figure that Father could not be.

¶ 47 Mother also testified about the minor's involvement in the community, explaining that Mother, Gregory R., and the minor attended church every week, which the minor always looked forward to. The minor felt comfortable and loved within the church community. The minor had her own bedroom at home, and took part in family holidays.

¶ 48 Mother further stated that Father had never reached out to inquire about the minor or offer any support. She testified that the minor did not have a strong relationship with Father, and she had not seen anyone from his side of the family for almost three years, apart from one time in 2024

14

when she saw Father's sister. Mother asserted that she had never cut off communication with anyone from Father's family, apart from Father himself. She said the minor had a good relationship with Mother's extended family. Mother's parents spent a lot of time with the minor and watched her when needed, and the minor enjoyed playing with her cousins, nieces, and nephews.[4] Gregory R.'s family lived out of town, so contact was more difficult, but Mother stated that the minor was still close with them.

¶ 49     Mother testified that the minor's strongest sense of attachment and security was with herself and Gregory R., and the minor would tell both of them that she loves them. The minor was involved in various activities, including swimming lessons and learning to ride a bike, and was doing well in kindergarten. Mother opined that if Father were to come into the minor's life at this point, it would be very disruptive for her. She would be confused, and destabilized, and it would negatively impact her ability to thrive. If the court granted the adoption petition, Mother did not oppose Father having a relationship with her one day. However, she asked that he first "truly heal," which would require "[s]ome very extreme changes," including sobriety, staying out of prison, and steady employment.

¶ 50     On cross-examination, Mother testified that the minor saw Father "a few times" whenever he was released from incarceration, but then Father would fall back into old habits, and Mother would step away from him again. The last time she saw Father was when she was three years old, and at that point, she called him "Daddy." Mother also stated that she was around Daphne Carter and her family fairly regularly for a period of approximately six to nine months, when the minor was one to two years old.

---

[4]Mother testified that she also had an adult daughter from a previous relationship.

¶ 51    Next, Gregory R. testified about his and Mother's jobs, and stated that they were financially able to provide for the minor. He said that the three of them lived together, and that he agreed with Mother's testimony regarding the timeline of his relationship with both Mother and the minor. He provided testimony similar to Mother's description of his paternal role in the minor's life, his efforts to teach her and play with her, and the strong, loving bond they shared. Gregory R. testified about the contents of various photo exhibits showing the three of them doing activities together. He stated that she was developing her identity and sense of self through these shared moments with Mother and himself, and she was also developing her faith life through their church, in which Gregory R. served as a deacon and volunteer.

¶ 52    Gregory R. further spoke on his marriage to Mother, stating that he involved the minor in that decision and discussed with her how he would fit into her life as her father. He stated that the minor called him "Greg," but also started calling him "Dad" ever since the wedding. He denied asking her to do so, and was not aware of Mother insisting upon it either.

¶ 53    Father then testified that the last time he saw the minor was in June of 2024, when Mother visited him at a job site and brought her along. She did not call him "Daddy," but Father believed that she knew who he was. He admitted to not being around her much, but said he had seen her about 20 times in her life. Father then testified about various family photo exhibits, including one of him holding the minor as a baby, and a few showing Father, Mother, the minor, and Father's family spending time together. He stated that he had had some opportunities to bond with the minor, "[a]t [Mother's] convenience."

¶ 54    Father stated that he was currently living in transitional housing through the Department of Veterans Affairs (VA) and would be moving into his own home in the next month. He worked about 34 hours per week as a line cook, and also worked part-time as a maintenance technician.

16

He attended Narcotics Anonymous meetings at least twice a week, and was also going to weekly meetings through the VA to address his substance abuse issues. He mentioned the certificates he had earned while incarcerated, in programs addressing behavioral issues and parenting instruction. Father stated that he intended to maintain the progress he was making in improving himself. He also planned to enroll in school to earn an associate's degree.

¶ 55    Father admitted that it would not be in the minor's best interest to be taken out of her current situation, and that it was good for her to have someone like Gregory R., who loved Mother and wanted to be involved in her life. However, he opined that it wasn't necessarily "one hundred percent the right thing to do to take away the chance for her to actually know her father if he puts in all the work and does everything that he actually said he's going to do." Father continued, stating that he was not asking to be in the minor's life at present, but that he wanted the chance "to actually give the effort" that he said he would. He also recognized that, if the court did not terminate his rights, he would likely start off with limited visitation, and he accepted this because he did not wish to disturb the minor's current situation.

¶ 56    He also believed that the minor would want to one day meet him, but whether he would deserve to see her would be up to him. He testified that he loved the minor and cared about her, and that he took accountability for his actions. He was grateful that the minor was currently in an environment where she felt happy and loved, but he felt there were things that he could offer her that no other man could, as he was her father.

¶ 57    On cross-examination, Father stated that Mother would come in and out of his life "with no rhyme or reason," and while he did not understand her disappearances, he always held out hope and never gave up on seeing his daughter. He also believed that he satisfied Mother's request for one year of consistent, stable behaviors and lifestyle, but Mother never followed through on her

17

promise to allow him to see the minor. Father also denied having been in prison 12 times, explaining that he was sentenced four times and then was "in and out *** on violations." He also denied ever using drugs since the minor's birth.

¶ 58   He testified that he should have petitioned for visitation as soon as Mother removed him from her home and filed for an order of protection against him, but he asserted that he fought for visitation throughout the minor's life, by trying to work things out with Mother. However, he did not petition for visitation in the order of protection case.

¶ 59   Next, Daphne Carter testified that when the minor was born, Father's family was allowed to see her for five or six weeks, and then Mother decided she did not want them in the minor's life. The next time they saw the minor was in December of 2021, when Mother surprised Carter by bringing the minor over for Carter's birthday. For a while after, Mother and the minor spent time with Father's family at least every weekend, until February of 2023, when Mother again cut off contact. That was the last time Carter ever saw the minor. Carter believed that Father was truly making an effort to get his life on track, and was committed to doing the right thing.

¶ 60   Following argument, the circuit court addressed the statutory best-interest factors, applying its findings from the evidence presented. The court found that it was "obvious" that the minor was doing well in her current situation, and her physical safety and welfare were being met. The minor had lived with Mother her entire life, and was developing her identity under Mother's care. As for her background and ties, she was close with Mother's extended family and with her stepfather. Mother and Gregory R. had a strong religious background, and the minor enjoyed being involved at church.

¶ 61   The court noted that the next factor, the minor's sense of love and attachment, was particularly important. The minor was almost six years old, and barely knew Father. She never had

18

a relationship with him because he spent most of her life incarcerated or in rehab. She did not feel love from him. By contrast, she did feel love, attachment, and a sense of being valued from the petitioners. She had security and familiarity with them as well. She had known Mother all her life, and had built a significant bond with Gregory R. since 2023. The factor of continuity and the least disruptive placement for the minor also favored the petitioners, as she was thriving in her current situation. She also had strong community ties at church, school, and with her friends. She needed permanence, and she had that with the petitioners.

¶ 62 The circuit court further found that Father clearly loved the minor. The court commended him on his release from IDOC custody, securing housing, holding two jobs, and taking steps to remain sober. However, the court balanced his recent efforts against the almost six years in which he had never had a significant relationship with the minor. Therefore, the court concluded that the petitioners had proven by a preponderance of the evidence that it was in the minor's best interest to terminate Father's parental rights.

¶ 63 The circuit court entered a judgment for adoption on February 13, 2026, finding that the minor had a close and loving familial relationship with both petitioners, and the petitioners had sufficient ability and means to properly provide for her. The court wrote that it would be in the minor's best interest that she be adopted by the petitioners, and granted the petition. This appeal followed.

¶ 64                                      II. ANALYSIS

¶ 65 On appeal, Father argues the circuit court's findings that he was an unfit parent and that termination of his parental rights was in the minor's best interest were against the manifest weight of the evidence. We reject both contentions.

¶ 66                    A. The Circuit Court's Finding of Unfitness

¶ 67    Before a minor may be adopted, the minor's natural parents or guardian must either consent

to the adoption, or be found unfit by the court pursuant to section 1(D) of the Adoption Act (750

ILCS 50/1(D) (West 2024); see *In re Adoption of Syck*, 138 Ill. 2d 255, 259 (1990); see also

*Douglas R.S. v. Jennifer A.S.*, 2012 IL App (5th) 110321, ¶ 3. The parties petitioning for the

minor's adoption must first prove parental unfitness by clear and convincing evidence. *In re*

*Adoption of Syck*, 138 Ill. 2d at 273-74. At the unfitness stage, the focus is solely on the conduct

of the parent. *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 5. If the court makes a finding of

unfitness, it next considers whether termination of the parent's rights is in the best interests of the

child. *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 5.

¶ 68    As applicable to the underlying case, the Adoption Act defines an "unfit person" as

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
> * * *
> (b) Failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare.
> * * *
> (i) *** There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(b), (D)(i) (West 2024).

¶ 69    A finding of unfitness under subsection 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b)

(West 2024)) is based on a subjective analysis, which focuses not on the parent's success, but

rather on the reasonableness of his or her efforts, taking into account his or her particular

difficulties and circumstances. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Simply demonstrating

some interest in or affection towards the child does not render a parent fit under this subsection;

rather, the parent's interest, concern, and/or responsibility must be reasonable. *In re D.P.*, 2024 IL

20

App (1st) 231530, ¶ 33. Furthermore, "[b]ecause the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a sufficient basis for unfitness." *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33. Infrequent or irregular visitation with the child has been held to be sufficient evidence warranting a finding of unfitness under this subsection. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (quoting *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 70    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 71    On appeal, Father challenges both grounds upon which the circuit court made its unfitness determination. Regarding subsection 1(D)(b), Father admits that he "could have better expressed a reasonable degree of interest, concern, or responsibility" as to the minor's welfare, but argues that "his failure to do so was severely hindered by his particular circumstances."

¶ 72    He first contends that he provided Mother with money and birthday presents for the minor whenever he could, including by allowing Mother to use his LINK card, and there was no testimony that Mother ever pursued child support or requested more financial assistance from

21

Father than what he offered. Father adds that he did not have a job for over half of the minor's life because of his admittedly "consistent and repeated incarceration," and thus his ability to financially support the minor was limited by his poverty.

¶ 73    He also points to his incarceration as an obstacle to visitation with the minor, and adds that Mother never brought the minor to visit him in jail or prison. He further states that Mother would cease contact with him upon his release from custody. Despite this, he asserts that he always tried to remain in contact with Mother in the hopes that he would be able to see his daughter. He also points to the order of protection and no contact order that were collectively in place throughout the minor's life, further limiting his opportunities to inquire after her wellbeing. Father contends that he "still took the risk of further criminal penalties just to hear about" the minor. Father concludes that his efforts were reasonable in light of his specific situation, namely his incarcerations and the court orders limiting contact.

¶ 74    We agree with Father that these circumstances made it difficult for him to demonstrate interest, concern, or responsibility for the minor's welfare. However, what Father does not mention is that these obstacles were the results of his own actions. As the circuit court found, Father was incarcerated or in rehab for the majority of the minor's life through his own life choices, and this prevented him from ever developing a meaningful relationship with the minor.

¶ 75    Father states that he risked criminal penalties to contact Mother and inquire about the minor. We decline to find that his violation of an order of protection amounts to reasonable efforts to show interest, concern, or responsibility regarding the minor's wellbeing. Father ignores the reasons for the order of protection's (and the no contact order's) existence. The circuit court found Mother's testimony to be credible, where she spoke of Father's repeated abuse, aggression, and drug use, as well as his frequent messages even after the order of protection was in place.

22

¶ 76    On appeal and in his testimony before the circuit court, Father presented the facts as if Mother's decisions to cut off contact with him throughout the minor's life were random and arbitrary. However, the record on appeal shows that Mother clearly expressed why she felt that Father could not be a stable, safe presence for the minor. Father also admitted that he understood Mother's conditions of maintaining sobriety, holding steady employment, and living in accordance with the law for a year, although he disputed her testimony that he failed to meet these requirements. Father additionally recognized that there was a lot of work he needed to do before he could be a suitable parent to the minor.

¶ 77    In light of the evidence of Father's behavior throughout the minor's life, we disagree with his implication that Mother thwarted his efforts to show his care and support for the minor by limiting contact with him. We further find that Father's failures to meet Mother's conditions weigh against his argument that his efforts were reasonable given his circumstances—not because Mother required him to meet these conditions, but because they are fundamental elements of being fit to parent.

¶ 78    The record on appeal shows that Father attempted to assure the circuit court that he had recently taken steps to improve himself—such as earning career-related and parenting certificates while incarcerated during 2024 and 2025—and would make positive choices going forward. However, the circuit court also heard testimony from Mother and Cole that Father had a pattern of making promises to change and then failing to follow through on them. Father's statements admitting that he knew he had to improve himself in order to be a suitable parent for his daughter are not sufficient evidence of his reasonable efforts. That requires actions, and the evidence of Father's actions demonstrating a reasonable degree of interest, concern, or responsibility regarding the minor's welfare was scant. The circuit court acknowledged the limited financial support that

23

he provided, but it concluded that Father did not provide any meaningful degree of financial, physical, or emotional support throughout the minor's life, even when he was not incarcerated.

¶ 79    Father also notes on appeal that he testified that he never gave up hope that he and Mother could reach an agreement that would allow him to be in the minor's life. This was despite his failure to petition the court for visitation and parenting time with the minor until three months after Mother filed the petition for adoption. Father's hope may well have been genuine. However, just like his promises for the future, his expression of hope does not demonstrate reasonable efforts.

¶ 80    Last, we note that there is a distinction between the times Father was in rehab versus jail or prison—his attempts to get clean from drugs and maintain sobriety arguably do demonstrate his care for the minor, and these efforts are not undone by his relapses. However, when balanced against his incarcerations, the order of protection and no contact order, and Mother's testimony regarding why she limited her contact with him, we find that Father's efforts were not reasonable in light of his subjective position, where he could have avoided being so obstructed from having any relationship with the minor had he made different choices.

¶ 81    A single basis for parental unfitness is sufficient to sustain the circuit court's finding. *In re Gwynne P.*, 215 Ill. 2d 340, 363 (2005). Thus, having found that the circuit court's unfitness determination pursuant to subsection 1(D)(b) of the Adoption Act was not against the manifest weight of the evidence, we need not reach its decision on the grounds of depravity.

¶ 82                        B. The Circuit Court's Best-Interest Finding

¶ 83    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable,

loving home life." *In re D.T.*, 212 Ill. 2d at 364. At this stage of the termination proceedings, the petitioner bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 5; *Harold K. v. Ryan B.*, 313 Ill. App. 3d 692, 699 (2000) ("In an adoption setting, the trial court must base its decision 'on the welfare and best interests of the child. 750 ILCS 50/15.1(c) (West 1994).' ")

¶ 84    In making a best-interest determination, the court must consider all relevant factors, including, but not limited to, the following factors listed in section 15.1 of the Adoption Act (750 ILCS 50/15.1(b) (West 2024)):

"(1) the wishes of the child;

(2) the interaction and interrelationship of the child with the applicant to adopt the child;

(3) the child's need for stability and continuity of relationship with parent figures;

(4) the wishes of the child's parent as expressed in writing prior to that parent's execution of a consent or surrender for adoption;

(5) the child's adjustment to the child's present home, school and community;

(6) the mental and physical health of all individuals involved;

(7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings;

(8) the background, age and living arrangements of the applicant to adopt the child;

(9) the criminal background check report presented to the court as part of the investigation required under *Section 6* of this Act." 750 ILCS 50/15.1(b) (West 2024);

*In re Adoption of C.D.*, 313 Ill. App. 3d 301, 307-08 (2000).

¶ 85    As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit

25

court's best-interest determination unless it is against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 86 Before proceeding with a summary of Father's challenge to the circuit court's best-interest findings, we note that in his argument on appeal, Father refers to the statutory best-interest factors found in section 1-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-3(4.05) (West 2024)), which are applicable to a court's best-interest determination upon the State's filing of a petition to terminate parental rights. While the language used in that section and section 15.1 of the Adoption Act is not identical, the factors are substantively similar, and the Adoption Act allows the court to review other relevant factors beyond those listed in section 15.1. Furthermore, our supreme court in *In re M.M.*, 156 Ill. 2d 53 (1993) explained as follows:

> "Obviously, best interests considerations under the Juvenile Court Act and the Adoption Act are not mutually exclusive. However, the juvenile court's best interests considerations, in the context of a termination proceeding, are limited to a determination of whether it is in the child's best interests to be freed for adoption. By contrast, best interests considerations in the context of an adoption proceeding concern the appropriateness of a particular adoption placement." *In re M.M.*, 156 Ill. 2d 53, 67 (1993).

¶ 87 We find that, regardless of the language used, the record here does not contain evidence indicating that an adoption placement with Mother would be inappropriate. We therefore preserve the language Father uses in his appellant brief, but make our determination regarding the circuit court's best-interest finding pursuant to the Adoption Act. See 750 ILCS 50/2.1 ("This Act shall be construed in concert with the Juvenile Court Act of 1987 ***"); see also *In re A.S.B.*, 381 Ill. App. 3d 220, 221-22 (2008) (stating that, in cases under the Juvenile Court Act or the Adoption

26

Act, "the goals of the termination proceedings are the same: (1) to determine whether the natural parents are unfit and if so (2) to determine whether adoption is in the child's best interests.").

¶ 88    Addressing the specific best-interest factors, Father admits that "the majority of the statutory factors *** weigh in favor of termination." However, he contends that the "uniqueness of this family" and Father's "obvious love for his daughter" make it so that termination of his parental rights is not in the minor's best interest. He adds that he accepted his situation and that he was not in a good position to be a parent to the minor, but argues that this shows his growth throughout this process and that he is now on the right path to becoming a capable father. He notes that the minor called him "Daddy" at one point, and sometimes calls Gregory R. "Greg," which he argues shows that the minor recognizes his role as her father. Last, Father asserts that Mother stated she was not opposed to Father being a part of the minor's life, as long as he made the necessary changes.

¶ 89    Given Father's admission that the balance of the statutory best-interest factors weighs in favor of termination, we need not extend our discussion much further, as we find that the record clearly supports this position. Father's point that the minor called him "Daddy" on one of the very few occasions that she ever saw him is overshadowed by the much more extensive testimony from Mother and Gregory R., as well as the GAL's report, showing the minor's loving, familial relationship with her stepfather, who she calls "Daddy" in addition to his name, and with whom she has built a strong bond.

¶ 90    Father does not challenge the circuit court's findings that the minor is in a safe and stable living situation, that she has permanence, a sense of identity, and feelings of love and attachment with Mother and Gregory R., and that the minor's current situation provides her with permanence. While we do not dispute that Father loves his daughter, that is not the appropriate question at the

27

best-interest stage. *In re D.T.*, 212 Ill. 2d at 364. In light of the testimony presented at the best-interest hearing, we agree with the circuit court that the State met its burden of proving by a preponderance of the evidence that it was in the minor's best interest to terminate Father's parental rights. We further find that the circuit court's determination was not against the manifest weight of the evidence, where the evidence strongly supported a finding that the relevant statutory factors came out in favor of termination.

¶ 91                                   III. CONCLUSION

¶ 92    For the reasons stated, the circuit court did not err in terminating the respondent's parental rights to the minor. The judgment of the circuit court is affirmed.

¶ 93    Affirmed.